IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEFFREY B.,[1]

                Plaintiff,

        v.

ANDREW M. SAUL, Commissioner of Social
Security,

                Defendant.

Case No. 6:18-cv-00851-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       Jeffrey B. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of his application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has

jurisdiction to hear Plaintiff's appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained

below, the Court reverses the Commissioner's decision and remands this case for an award of

benefits.

---

     [1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party here. When applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

## BACKGROUND

Plaintiff was born in November 1969, making him forty years old on December 1, 2009, the alleged disability onset date. (Tr. 64, 80.) Plaintiff is a high school graduate who attended one year of college and has past relevant work as a senior software engineer. (Tr. 22, 37, 53, 222.) In his DIB application, Plaintiff alleges disability because of fibromyalgia, osteoarthritis, anxiety, depression, posttraumatic stress disorder ("PTSD"), and degenerative disc disease.[2] (*See* Tr. 15, 64, 80.)

On August 20, 2014, the U.S. Department of Veterans Affairs ("VA") assigned Plaintiff a ninety percent service-connected disability rating based, in large part, on his fibromyalgia. (*See* Tr. 205-07.)

In a letter dated January 9, 2015, Plaintiff's primary care physician, Norbert Gerondale, M.D. ("Dr. Gerondale"), informed the VA that he "recommended individual unemployability" for Plaintiff.[3] (Tr. 703.) In support of his recommendation, Dr. Gerondale noted that Plaintiff

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status] . . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2015 (*see* Tr. 13) reflects the date on which his insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that he was disabled on or before December 31, 2015, he is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15–cv–02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

[3] Typically, the VA assigns a total disability rating based on individual unemployability ("TDIU") "when a veteran demonstrates an inability to maintain substantially gainful employment as a result of a service-connected disability." *Sudranski v. Shulkin*, 683 F. App'x 961, 962 n.2 (Fed. Cir. 2017) (citing *Sturdivant v. Shinseki*, 480 F. App'x 992, 995 (Fed. Cir. 2012)).

suffers from: (1) fibromyalgia, (2) dyssomnia "due to disrupted sleep rhythms as a result of the chronic pain syndrome as well as chronic back pain," (3) chronic "fatigue syndrome causing a severe lack of energy and difficulty thinking and concentrating throughout the day," (4) chronic "flu-like symptoms, malaise, dizziness, nausea and dozing off unexpectedly," (5) major "depression, recurrent, severe, without psychosis, but with mild attendant anxiety [and] agitation," which "results in occupational and social impairment in most areas," and (6) chronic "back pain as a result of lumbosacral strain, arthritis in the right knee, patellofemoral syndrome of both knees, bilateral ankle pain due to recurrent sprains and strains, metatarsalgia and [pes] cavus deformity and hammer toes, [and] tibial neuropathy at medial malleolus right and left leg." (Tr. 703.)

On March 19, 2015, Martin Lahr, M.D. ("Dr. Lahr"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 72-73.) Dr. Lahr determined that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, and sit, stand, and walk for about six hours during an eight-hour workday. Dr. Lahr added that Plaintiff can push and pull in accordance with his lifting and carrying restrictions and engage in no more than occasional overhead reaching bilaterally. In addition, Dr. Lahr concluded that Plaintiff does not suffer from any postural, visual, communicative, or environmental limitations.

On March 23, 2015, Megan Nicoloff, Psy.D. ("Dr. Nicoloff"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 70.) Based on her review of Plaintiff's medical records, Dr. Nicoloff determined that Plaintiff's mental impairments failed to meet or equal listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

Also on March 23, 2015, Dr. Nicoloff completed a mental residual functional capacity assessment form, in which she rated Plaintiff's limitations in each of thirteen categories of mental ability. (Tr. 73-75.) Dr. Nicoloff rated Plaintiff as not significantly limited in nine categories and moderately limited in four categories. She also stated that Plaintiff can "carry out two to three step tasks independently without special supervision," maintain adequate hygiene and grooming, work independently, and "have occasional, indirect public and coworker contact." (Tr. 73-75.)

On April 22, 2015, Plaintiff's treating psychologist, Rex Turner, Ph.D. ("Dr. Turner"), completed a mental residual functional capacity assessment form, in which he rated Plaintiff's limitations in each of twenty categories of mental ability. (Tr. 696-99.) Dr. Turner rated Plaintiff to be severely limited in terms of his ability to "travel in unfamiliar places or use public transportation," and his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 698-99.) In addition, Dr. Turner concluded that Plaintiff suffers from moderately severe limitations on his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, set realistic goals or make plans independently of others, and "get along with co-workers or peers without distracting them or exhibiting behavioral extremes." (Tr. 697-99.)

On May 15, 2015, Susan Moner, M.D. ("Dr. Moner"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 89-90.) Dr. Moner

determined that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, and sit, stand, and walk for about six hours in an eight-hour workday. Dr. Moner added that Plaintiff can push and pull in accordance with his lifting and carrying restrictions and engage in no more than frequent overhead reaching bilaterally. In addition, Dr. Moner concluded that Plaintiff does not suffer from any postural, visual, communicative, or environmental limitations.

On May 18, 2015, Winifred Ju, Ph.D. ("Dr. Ju"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 87-88.) Dr. Ju agreed with Dr. Nicoloff that Plaintiff's mental impairments failed to meet or equal listings 12.04 and 12.06.

Also on May 18, 2015, Dr. Ju completed a mental residual functional capacity assessment form, in which she rated Plaintiff's limitations in each of thirteen categories of mental ability. (Tr. 90-92.) Dr. Ju agreed with Dr. Nicoloff that Plaintiff was not significantly limited in nine categories and moderately limited in four categories. She also agreed that Plaintiff can "carry out two to three step tasks independently without special supervision," maintain adequate hygiene and grooming, work independently, and "have occasional, indirect public and coworker contact." (Tr. 91-92.)

On January 19, 2016, the VA referred Plaintiff to Kacy Mullen, Ph.D. ("Dr. Mullen"), for a Compensation and Pension Examination. (Tr. 785-93.) Dr. Mullen conducted a seventy-five minute clinical interview, reviewed Plaintiff's medical records, and administered several tests. (Tr. 788-89.) Dr. Mullen stated that Plaintiff was "judged to be a truthful and reliable reporter of his circumstances within the limits of his limited insight." (Tr. 792.) Dr. Mullen also stated that Plaintiff suffers from depressed mood, anxiety, panic attacks that "occur weekly or less often,"

chronic sleep impairment, mild memory loss, flattened affect, disturbances of motivation and

mood, and difficulty "establishing and maintaining effective work and social relationships."

(Tr. 791-92.)

Dr. Mullen concluded that Plaintiff continues to meet the diagnostic criteria for insomnia

and major depressive disorder and "[p]sychological [f]actors [a]ffecting [o]ther [m]edical

[c]onditions." (Tr. 793.) Dr. Mullen also determined that (1) Plaintiff's reported "symptoms are

significant and have had moderate to severe impacts upon his social and occupational

functioning," (2) Plaintiff's test results were "consistent with [the] information gathered during

the diagnostic and social history interviews for the presence and level of symptomatology," (3)

Drs. Gerondale and Turner "have indicated agreement with [Plaintiff's] symptoms," (4) Plaintiff

could not recall significant dates or complete Serial 7's, and (5) Plaintiff "would benefit from

working alone and remotely in a familiar environment, being given written instead of verbal

instructions, supervised interactions with coworkers and/or customers, and a highly flexible

schedule with [the] ability to take breaks as much and as often as needed." (Tr. 793-94.)

In a report to the VA dated January 19, 2016, Lucinda Dykes, M.D. ("Dr. Dykes"),

addressed Plaintiff's fibromyalgia. (Tr. 795-98.) Dr. Dykes stated that Plaintiff "began to

develop widespread joint pain" in 2007, Plaintiff's "pain has continued and progressed" since the

VA first diagnosed him with fibromyalgia in 2010, Plaintiff "continues to meet [the] American

College of Rheumatology criteria for fibromyalgia," and Plaintiff's "disabling pain continues."

(Tr. 796.) In addition, Dr. Dykes stated that (1) Plaintiff exhibited tender points for pain present,

(2) Plaintiff suffers from widespread musculoskeletal pain, stiffness, fatigue, sleep disturbances,

paresthesia, headaches, depression, anxiety, irritable bowel syndrome, and mild cognitive

symptoms, (3) Plaintiff's "chronic pain from fibromyalgia, including sleep difficulties and

cognitive symptoms, would interfere with his ability to work as a software engineer," (4) Plaintiff's chronic pain would "make it impossible for him to stay in one position for any length of time, so even sedentary work is not possible for any extended length of time," and (5) Plaintiff is constantly "trying to find a comfortable position, and this position is constantly changing." (Tr. 797-98.)

In a ratings decision dated April 2, 2016, the VA granted Plaintiff's claim for a TDIU, effective June 5, 2013. (Tr. 303-05.) This decision was based on, among other things, Dr. Gerondale's opinion and Drs. Dykes' and Mullen's exams, which showed that Plaintiff was "unable to maintain physical or sedentary employment due to his service-connected conditions." (Tr. 303-04.)

On March 23, 2017, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 35-62.) Plaintiff testified that he attended one year of technical college, he worked for nearly twenty years as a software engineer and database developer, he stopped working as a software engineer in December 2009, his ex-wife ran a daycare business out of their home in 2012 and 2013, he provided "very minimal" assistance in running the daycare business, and his accountant put the daycare earnings on his "tax form[] to better [their] returns." (Tr. 37-39.) Plaintiff also testified that he suffers from an "extraordinary amount of pain" because of back and knee issues and fibromyalgia, frequent headaches, chronic fatigue, difficulty sleeping, depression, and "concentration issues," and he cannot sit for more than fifteen minutes at a time because of back and knee pain. (Tr. 44-52.) Plaintiff further testified that he lies in his recliner most of the day, he takes his dog for short walks, he cannot perform yardwork, he can perform only one household chore per day, he does not have friends, he rarely communicates

with his family, and he sold his motorcycle and snowboarding and scuba diving equipment.
(Tr. 44-52.)

The ALJ posed hypothetical questions to a Vocational Expert ("VE") who testified at the administrative hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform medium work, subject to these limitations: (1) Plaintiff cannot climb ladders, ropes, or scaffolds; (2) Plaintiff cannot be exposed to workplace hazards, such as machinery and unprotected heights; (3) Plaintiff can "understand, remember, and carry out only short and simple instructions"; (4) Plaintiff "can only make simple work-related judgments and decisions"; (5) Plaintiff "can have no more than frequent proximity contact with the public and can have no more than frequent interactive contact with co-workers and supervisors." (Tr. 53-54.) The VE testified that the hypothetical worker could not perform Plaintiff's past relevant work as a senior software engineer, but the hypothetical worker could perform the jobs of document preparer, dishwasher kitchen helper, industrial cleaner, and laundry worker.

Second, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work, subject to these limitations: (1) Plaintiff "can only occasionally stoop, crouch, kneel, and crawl"; (2) Plaintiff cannot climb ladders, ropes, or scaffolds; (3) Plaintiff cannot be exposed to workplace hazards, such as machinery and unprotected heights; (4) Plaintiff "can understand, remember, and carry out only short and simple instructions"; (5) Plaintiff "can only make simple work-related judgments and decisions"; and (6) Plaintiff "can have no more than frequent proximity contact with the public and have no more than frequent interactive contact with co-workers and supervisors." (Tr. 56.) The VE testified that the hypothetical worker could not perform Plaintiff's past relevant work,

but he could perform the jobs of laundry sorter, small products assembler, and merchandise marker.

Third, the ALJ asked the VE to assume that the hypothetical worker described in the second hypothetical also needed to "be permitted to lie down or recline in excess of 90 minutes during an eight-hour day." (Tr. 57.) The VE testified that this added limitation would preclude employment.

Plaintiff's counsel also posed questions to the VE who testified at the administrative hearing. Responding to Plaintiff's counsel's questions, the VE confirmed that the hypothetical worker could not sustain gainful employment if he: (1) "would need a highly flexible schedule with the ability to take breaks as much and as often as needed"; (2) suffered from moderately severe limitations in seven specific categories of mental ability; and (3) suffered from severe limitations on his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without [extra breaks]." (Tr. 58-61.)

In a written decision issued on May 2, 2017, the ALJ applied the five-step process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I. LEGAL STANDARD

A claimant is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps of the sequential process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential process to determine whether Plaintiff is disabled. (Tr. 13-24.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 1, 2009, the alleged disability onset date. (Tr. 15.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "[F]ibromyalgia, osteoarthritis, anxiety, depression, posttraumatic stress disorder, and degenerative disc disease." (Tr. 15.) At step three, the ALJ concluded that Plaintiff did not have

an impairment that meets or equals a listed impairment. (Tr. 15-16.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff "can occasionally stoop, crouch, kneel, and crawl"; (2) Plaintiff can "never climb ladders, ropes, or scaffolds"; (3) Plaintiff "cannot have any exposure to hazards, such as machinery and unprotected heights"; (4) Plaintiff "can understand, remember, and carry out only short and simple instructions"; (5) Plaintiff "can only make simple work related judgments and decisions"; and (6) Plaintiff "can have no more than frequent proximity contact with the public and no more than frequent interactive contact with coworkers and supervisors." (Tr. 17.) At step four, the ALJ determined that Plaintiff could not perform his past work as a senior software engineer. (Tr. 22.) At step five, the ALJ determined that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a laundry sorter, small products assembler, and merchandise marker. (Tr. 23.)

## ANALYSIS

### I.     STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir.

2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole supports more than one rational interpretation, the district court must uphold the ALJ's decision; it may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## II.    DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by failing to: (1) address the VA's disability ratings; (2) consider the opinion of Plaintiff's examining psychologist, Dr. Mullen; (3) provide legally sufficient reasons for discounting the opinions of Plaintiff's treating physician, Dr. Gerondale, and treating psychologist, Dr. Turner; and (4) provide clear and convincing reasons for discounting Plaintiff's testimony. As explained below, the Court finds that the Commissioner's decision was based on harmful legal error and unsupported by substantial evidence. The Court therefore reverses the Commissioner's decision and remands for an award of benefits.

### A.    VA Disability Rating

#### 1.    Applicable Law

The Ninth Circuit has "held that 'an ALJ must ordinarily give great weight to a VA determination of disability.'" *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694-95 (9th Cir. 2009) (quoting *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002)). "Nevertheless, because the VA and SSA criteria for determining disability are not identical, [the Ninth Circuit has] allowed an ALJ to give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.* at 695 (citation, internal quotation marks, and brackets omitted). Examples of "persuasive, specific,

valid reasons" for discounting a VA disability rating include (1) the fact that the ALJ interpreted the claimant's medical records differently, and (2) the fact that new evidence was available to the ALJ. *See, e.g.*, *Overlandmiller v. Colvin*, No. 6:13-cv-01663-SI, 2015 WL 350720, at *5 (D. Or. Jan. 26, 2015) ("The ALJ may, for example, interpret the medical records differently and therefore disagree with the VA about the disabling effects of particular impairments. The ALJ may also have available evidence that was not available to the VA. Both of these [reasons] meet the *McCartey* standard for discounting the VA's determination." (citing *Valentine*, 574 F.3d at 695)).

### 2. Application

Plaintiff argues that the ALJ erred by failing to address his August 2014 and April 2016 VA disability ratings. (Pl.'s Opening Br. at 2-4.) The Commissioner acknowledges that the ALJ's reasoning "could have been clearer," but argues the ALJ's decision satisfies the *McCartey* standard because: (1) the ALJ's subjective symptom analysis includes a paragraph that refers to and questions the completeness of the examination Dr. Gerondale performed on January 9, 2015;[4] (2) the VA relied in part on Dr. Gerondale's January 9, 2015 opinion in its April 2016 disability rating, which granted Plaintiff's TDIU claim; (3) the ALJ provided specific and legitimate reasons for discounting Dr. Gerondale's opinion in a different section than the subjective symptom analysis; and thus (4) the ALJ's path can "reasonably be discerned." (Def.'s Br. at 20-22.)

The Court disagrees. In *McCartey*, the VA determined that the claimant was eighty percent disabled because of his impairments. 298 F.3d at 1076. The ALJ did not mention the VA

---

[4] The ALJ referred to Dr. Gerondale's January 9, 2015 exam in the first paragraph of page twenty-one of her written decision, a part of the ALJ's subjective symptom analysis. The ALJ turned to the medical opinion evidence in the fourth paragraph on page twenty-one. (*See* Tr. 21.)

rating in his opinion. *Id.* The Ninth Circuit held that the ALJ erred in disregarding the claimant's VA disability rating, and therefore reversed the Commissioner's decision. *Id.* Similarly, in *Luther v. Berryhill*, 891 F.3d 872, 877 (9th Cir. 2018), the ALJ noted the claimant's VA disability rating at the hearing and in her written decision, but the ALJ "did not address how she had considered and weighed the VA's rating or articulate any reasons for rejecting it." *Id.* Instead, the ALJ merely acknowledged the VA disability rating "in two short portions of her decision." *Id.* The Ninth Circuit held that the ALJ provided no persuasive, specific, and valid reasons for rejecting the claimant's VA disability rating, noting that "[s]imply mentioning the existence of a VA [disability] rating in the ALJ's decision is not enough." *Id.*

Here, too, the ALJ erred by disregarding Plaintiff's VA disability ratings. The Commissioner acknowledges that the ALJ did not directly address the VA disability ratings, but argues that the ALJ adequately addressed and discounted Plaintiff's April 2016 VA disability rating by discounting a 2015 opinion on which the April 2016 rating relied. The Commissioner does not address the ALJ's silence as to the VA's 2014 disability rating or the evidence on which VA relied in 2014. (*Compare* Tr. 205-07, reflecting that on August 20, 2014, the VA assigned Plaintiff an "overall or combined rating [of] 90%" disability based on, among other things, fibromyalgia; *with* Tr. 303-05, noting that on April 2, 2016, the VA granted Plaintiff's TDIU claim, effective June 5, 2013, based on the "[r]ating decision dated August 15, 2014 and all the evidence contained therein"). The ALJ erred by failing to consider the VA's 2014 disability rating. *See Robinson v. Colvin*, No. 13-cv-00684-DFM, 2013 WL 5886128, at *2 (C.D. Cal. Oct. 31, 2013) ("[The ALJ] relied solely upon the VA's 2010 decision and ignored the [VA's] 2011 decision. This constitutes reversible error.").

In any event, the Commissioner's argument also fails to account for the fact that the VA's 2016 disability rating was based, in large part, on Drs. Dykes and Mullen's January 19, 2016 examinations, not just Dr. Gerondale's examination. (*See* Tr. 304, relying on Dr. Dykes and Mullen's January 19, 2016 examinations in granting Plaintiff's TDIU claim). The ALJ's opinion does not address these examinations, and discounting just one of the three medical opinions on which the 2016 VA rating was based was not sufficient to discredit the 2016 VA rating.[5]

Based on these reasons, the Court finds that the ALJ committed reversible error by failing to consider Plaintiff's VA disability ratings and failing to address relevant medical evidence. *See McLeod v. Astrue*, 640 F.3d 881, 886 (9th Cir. 2011) (explaining that an "ALJ must consider the VA's finding in reaching [her written] decision" (citing *McCartey*, 298 F.3d at 1076)); *see also Robinson*, 2013 WL 5886128, at *2 ("Although an ALJ may disregard a VA rating if the ALJ considers evidence which the VA did not or if the VA rating is based upon evidence which the ALJ rejects, . . . this presupposes that the ALJ actually considers the VA rating and provides legitimate reasons for rejecting it. Here, the ALJ did not.").

## B.    Medical Opinion Evidence

### 1.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine*, 574 F.3d at 692. If "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a

---

[5] The Court also finds the Commissioner's reliance on *Valentine* misplaced because, unlike in *Valentine*, the ALJ here did not explicitly address the VA disability ratings "in the same paragraphs in which [she] justified her decision to discredit" Dr. Gerondale's opinion. *Cf. Valentine*, 574 F.3d at 695 (noting that the ALJ's sufficient "explanation" for disregarding the claimant's VA disability rating "appeared in the same paragraph in which the ALJ justified her decision to discredit [a psychologist's] opinion," an "important part[] of the record before the VA").

treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### 2. Application

#### a. Dr. Mullen's Opinion

Plaintiff argues that the ALJ erred by failing to consider the opinion of his examining psychologist, Dr. Mullen. (Pl.'s Opening Br. at 4.) As discussed above, the ALJ's decision ignores Dr. Mullen's January 19, 2016 opinion, even though the VA's 2016 disability rating relied on it. The Commissioner asserts that the ALJ did not err by ignoring Dr. Mullen's opinion, relying on *Valentine*, 574 F.3d at 691, and *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010).

In *Valentine*, the Ninth Circuit addressed whether an ALJ ignored an examining psychologist's (Dr. Storzbach) opinion that the claimant should be limited to "'highly routinized, overlearned tasks with low cognitive demand.'" 574 F.3d at 691. The Ninth Circuit noted that

this limitation "appeared in a section of Dr. Storzbach's report entitled 'Recommendations,'" and that Dr. Storzbach did not state that the claimant was "incapable of working *except* under the recommended conditions." *Id.* In fact, Dr. Storzbach pointed out that the claimant's "'mostly normal test performance with multiple cognitive strengths suggest[ed] that [he was] capable of at least partially compensating for his deficits.'" *Id.* The Ninth Circuit therefore agreed that Dr. Storzbach's observation about "highly routinized, overlearned tasks with low cognitive demand" was simply a "recommended way" for the claimant "to cope with his PTSD symptoms," not "a diagnosis nor statement of [the claimant's] functional capacity." *Id.* at 691-92. Thus, the Ninth Circuit held that the ALJ did not err by excluding the limitation from the RFC. *Id.*

Similarly, in *Turner*, the Ninth Circuit addressed a claimant's argument that the ALJ improperly rejected the opinion of the claimant's treating VA psychologist (Dr. Koogler). 613 F.3d at 1222. The Ninth Circuit held that the ALJ did not need to provide clear and convincing reasons for rejecting Dr. Koogler's opinion because the ALJ incorporated Dr. Koogler's observations in the claimant's RFC. *Id.* at 1222-23.

The Commissioner argues that this case is like *Valentine* because Dr. Mullen "did not indicate that Plaintiff was incapable of work *except* under the recommended conditions." (Def.'s Br. at 19.) Dr. Mullen stated that Plaintiff would benefit from the following accommodations in order to ensure successful employment: "[W]orking alone and remotely in a familiar environment, being given written instead of verbal instructions, supervised interactions with coworkers and/or customers, and a highly flexible schedule with [the] ability to take breaks as much and as often as needed." (Tr. 794.) Unlike in *Valentine*, here Dr. Mullen did not make a companion finding that Plaintiff was capable of compensating for his deficits. In addition, Dr.

Mullen included his list of accommodations in the "Clinical Findings" section of her report, in which Dr. Mullen addresses "testing results" and provides conclusions. (Tr. 788, 792.) That is significant because the Ninth Circuit has held that ALJs are "responsible for translating and incorporating *clinical findings* into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (emphasis added). The ALJ did not address any of Dr. Mullen's clinical findings here.

The Commissioner also argues that this case is like *Turner* because "the ALJ incorporated Dr. Mullen's observations into the assessed RFC by finding that Plaintiff could understand, remember, and carry out only short and simple instructions, could make simple work related judgments and decisions, could have no more than frequent proximity contact with the public, and could have no more than frequent interactive contact with coworkers and supervisors." (Def.'s Br. at 19.) However, the ALJ's RFC fails to incorporate all of Dr. Mullen's observations. Specifically, the RFC does not address Plaintiff's need for written instead of verbal instructions, supervised interactions with coworkers or customers, or unscheduled work breaks.[6]

---

[6] The Commissioner also argues that Dr. Mullen examined Plaintiff a few weeks after his date last insured, and that an ALJ can discount an opinion that an "other source" issued "outside the relevant time period." (Def.'s Br. at 19, citing *Turner*, 613 F.3d at 1224). This argument fails for three reasons. First, Dr. Mullen is a psychologist (an acceptable medical source), not a social worker. *Cf. Turner*, 613 F.3d at 1224 (holding that the ALJ provided a germane reason for discounting a social worker's opinion and explaining that a social worker is not an acceptable medical source); *see also Kane v. Colvin*, No. 15-0843, 2015 WL 9595405, at *3 (W.D. Wash. Dec. 14, 2015) ("Social Security regulations distinguish between 'acceptable medical sources,' such as . . . psychologists, and 'other sources,' such as [social workers]. . . . [W]hile an ALJ must provide at least specific and legitimate reasons for rejecting the opinions of acceptable medical sources, the opinions of other sources are entitled to less deference and may be rejected with the provision of reasons germane to that source.") (citations omitted). Second, the ALJ never stated that she discounted Dr. Mullen's opinion based on the date of the examination. *Cf. Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014) ("[The ALJ] never stated that he rested [the relevant] determination on these findings. For that reason alone, we reject the government's argument [predicated on such findings]."). Third, Dr. Mullen's examination and opinion are

The Court finds that the ALJ committed harmful error by disregarding Dr. Mullen's opinion because the ALJ was required but failed to discuss Dr. Mullen's opinion, *see Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (stating that ALJs "must consider all medical opinion evidence") (citation omitted), and failed to address Dr. Mullen's clinical findings. *Rounds*, 807 F.3d at 1006.

### b.     Dr. Gerondale's Opinion

Plaintiff argues that the ALJ erred in discounting the opinion of his treating physician, Dr. Gerondale. (Pl.'s Opening Br. at 6.) Dr. Gerondale's opinion conflicts with the opinions of the non-examining state agency medical consultants, none of whom opined that Plaintiff cannot work. (*Compare* Tr. 703, *with* Tr. 78*, and* Tr. 96.) The ALJ therefore needed to provide specific and legitimate reasons for discounting Dr. Gerondale's opinion. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'") (citation omitted); *see also Kilian v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Kilian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ failed to do so here.

### 1)     Conflicting Objective Medical Evidence

The ALJ's opinion does not state how much weight she assigned to Dr. Gerondale's opinion, but the ALJ did provide two reasons for rejecting it. (*See* Tr. 21-22.) First, the ALJ discounted Dr. Gerondale's opinion because it is inconsistent with the "objective findings."

---

relevant to the period at issue because they addressed Plaintiff's pre-DLI ability to work and pre-DLI impairments and medical records.

(Tr. 21.) In support of this finding, the ALJ noted, among other things, that Plaintiff's "alleged pain complaints greatly exceed the objective findings, especially with respect to his alleged fibromyalgia." (Tr. 21.) The ALJ also explained that although Plaintiff has exhibited "12/18 tender points, the record does not [sic] 'repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions' and 'evidence that the physician rules out other physical or mental disorders that could cause the symptoms or signs.'" (Tr. 21-22) (citation omitted).[7] The ALJ erred in discounting Dr. Gerondale's opinion based on conflicting objective medical evidence.

In *Revels v. Berryhill*, 874 F.3d 648, 663 (9th Cir. 2017), the ALJ rejected a doctor's opinion about the severity of her patient's fibromyalgia because it was "supposedly not 'supported by objective medical evidence.'" *Id.* The ALJ relied on normal imaging and test results and "took issue" with the doctor's tender-point examinations. *Id.* The Ninth Circuit held that the ALJ's analysis showed "a fundamental lack of knowledge about fibromyalgia." *Id.* The Ninth Circuit explained that "a doctor need only find eleven out of eighteen tender points to diagnose" fibromyalgia, and that "tender-point examinations themselves constitute 'objective medical evidence' of fibromyalgia." 874 F.3d at 663. The Ninth Circuit also explained that there are no laboratory tests to confirm fibromyalgia. *Id.*

As in *Revels*, the ALJ here failed to evaluate Dr. Gerondale's opinion in light of fibromyalgia's unique symptoms and diagnostic methods. *See Revels*, 874 F.3d at 662 (stating that "the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods" and that the "failure to do so is error"). Indeed, although the ALJ discounted

---

[7] Contrary to the ALJ's conclusion, the record reflects that to support a fibromyalgia diagnosis, there must be evidence of "either . . . a physical examination of the claimant . . . with at least 11 positive tender point sites or . . . repeated manifestations of six or more fibromyalgia symptoms [or] signs." (Tr. 16.)

Dr. Gerondale's opinion based on unremarkable imaging and examination results, the record includes several tender-point examinations that constitute objective medical evidence of fibromyalgia. (*See* Tr. 330, "[The] patient had multiple trigger points involving bilateral trapezius, scapular region, shoulders, lumbar paraspinal, hips, and knees."; Tr. 336-37, "He . . . was tender at 12 of the 18 fibromyalgia trigger points. . . . [He] currently meets the criteria for fibromyalgia causing body wide pain associated with sleep disturbances and chronic pain."; Tr. 500, "He was diagnosed with fibromyalgia several years ago . . . . He is tender to 12/18 fibromyalgia tender points[.]").

The record also reveals that Dr. Dykes examined Plaintiff three weeks after Plaintiff's date last insured and reviewed Plaintiff's medical records. (Tr. 795-96.) Dr. Dykes determined that Plaintiff "*continues* to meet [the] American College of Rheumatology criteria for fibromyalgia." (Tr. 796) (emphasis added). This evidence weighs heavily in favor of finding reversible error because the Social Security Administration also bases its evaluation of fibromyalgia on the American College of Rheumatology criteria. *See, e.g.*, *Bair v. Comm'r of Soc. Sec. Admin.*, No. 3:17-cv-622-BR, 2018 WL 2120274, at *5 (D. Or. May 8, 2018) (holding that the ALJ failed to evaluate the plaintiff's fibromyalgia given its unique symptoms and diagnostic methods, rejecting the ALJ's reliance on the plaintiff's unremarkable imaging and exams, and noting that the Social Security Administration "bases its evaluation of fibromyalgia on the American College of Rheumatology criteria" and that a doctor determined that the plaintiff "met the American College of Rheumatology criteria for fibromyalgia").

In addition, there are "a number of symptoms that are considered to be clinical 'signs' of fibromyalgia including muscle pain, fatigue or tiredness, muscle weakness, headache, numbness or tingling, dizziness, insomnia, depression, nausea, vomiting, or nervousness." *Bair*, 2018 WL

2120274, at *5 (citation omitted). Substantial evidence in the longitudinal record supports Dr. Gerondale's medical opinion regarding Plaintiff's fibromyalgia. (*See* Tr. 703, reflecting that Dr. Gerondale's findings included chronic flu-like symptoms, malaise, dizziness, nausea, depression, and anxiety; Tr. 797, reflecting that Dr. Dykes' findings, signs, and symptoms included widespread musculoskeletal pain, stiffness, fatigue, sleep disturbances, paresthesia, headache, depression, anxiety, and irritable bowel symptoms).

The Commissioner asserts that, even if the ALJ "violated a rule set forth in *Revels*, any error was harmless because the ALJ found that there was a lack of objective evidence with respect to Plaintiff's impairments *other than* fibromyalgia." (Def.'s Br. at 8.) The Commissioner's argument is unpersuasive. Plaintiff's medical records largely pertain to his fibromyalgia, the main source of his disability. (*See* Tr. 21, recognizing that Plaintiff alleges that fibromyalgia-related "pain is his primary limitation"; Tr. 44, reflecting that Plaintiff testified that his fibromyalgia symptoms, such as "extraordinary" pain, fatigue, and insomnia, are the main source of his disability; Tr. 703, noting that Plaintiff's VA disability rating for fibromyalgia is seventy percent). That was also true in *Revels*. *See Revels*, 874 F.3d at 652-56 (explaining that the plaintiff's record largely pertained to fibromyalgia and therefore the case turned on whether the ALJ erred in rejecting a medical opinion about the plaintiff's fibromyalgia-related limitations). Thus, as in *Revels*, it would be inappropriate to discount Dr. Gerondale's opinion based on conflicting objective evidence when there is objective evidence in the record that supports Dr. Gerondale's opinion about fibromyalgia-related limitations and Plaintiff's pain testimony.

In sum, the ALJ erred in rejecting Dr. Gerondale's opinion as unsupported by objective evidence.

### 2) Plaintiff's Activities

The ALJ also discounted Dr. Gerondale's opinion because it conflicted with Plaintiff's activities. (Tr. 21.) "Such a conflict may justify rejecting a treating provider's opinion." *Ghanim*, 763 F.3d at 1162. Here, however, substantial evidence does not support discounting Gerondale's opinion on this ground.

The ALJ did not consider Plaintiff's activities in the proper context. For example, the ALJ noted that Plaintiff reported hiking. (Tr. 21.) Two months after his alleged disability onset date, Plaintiff reported that he hikes with his wife "once a month or so," but he also reported that he "has difficulty hiking" and he is in pain "for several days" after hiking. (Tr. 366.) Nothing in the record reflects that Plaintiff actually hiked during the alleged period of disability. That is significant because the record reveals that Plaintiff can no longer hike. (*See* Tr. 229, reflecting that Plaintiff reported during the alleged period of disability that he "can no longer do many of the things [he] really like[s] doing, like hiking"; Tr. 309, noting that a person who knows Plaintiff reported that he "no longer goes for hikes or to the beach due to continued pain").

By way of further example, the ALJ noted that Plaintiff reported moving boxes. (Tr. 21.) Indeed, Plaintiff reported that he moved boxes at his house, but he also reported that he only moved five boxes at a time and that moving boxes caused his body to "hurt[]" and "exacerbate[d] [his] fibromyalgia" pain. (Tr. 664; *see also* Tr. 763, reflecting that Plaintiff hurt his back picking up a box; Tr. 768, documenting Plaintiff's report of "uncontrolled pain" after cleaning his garage; Tr. 770, stating that Plaintiff was in severe pain and would "not be continuing with his work in the garage"; Tr. 772, noting that Plaintiff reported that his pain level "increased to 8" on a ten-point scale and that he was "not sleeping well" after he tried to move boxes and work in his garage).

The ALJ also noted that Plaintiff reported lifting his 150-pound dog and walking his dog "up to a mile per day." (Tr. 21.) Plaintiff reported that he carried his 150-pound dog to his truck because the dog was having seizures and needed to see a veterinarian, but he also informed his provider that his pain was "aggravated by carrying heavy objects" (i.e., the dog). (Tr. 405-06, 650.) And while Plaintiff reported walking his dog a mile per day in early 2010, he also reported that walking his dog is his only form of exercise, he "walk[s] hunched over and limp[s] like an old man after short walks with [his] dog," and he reduced his walking to "less than an eighth of a mile . . . a couple times a day" at a park "next to [his] home." (Tr. 47-48, 52, 308, 364.)

Finally, the ALJ noted that Plaintiff reported working at a daycare. (Tr. 21.) However, the work Plaintiff performed at his ex-wife's in-home daycare business does not conflict with Dr. Gerondale's opinion about the severity of Plaintiff's fibromyalgia pain. (*See* Tr. 15, finding that Plaintiff's daycare work did not rise to the level of substantial gainful activity; Tr. 38, stating that Plaintiff provided "very minimal" assistance to his wife "for a couple hours here and there," and that "most of the time" Plaintiff assisted when she needed to use the bathroom or take a break; Tr. 754, reflecting that Plaintiff reported "working with his wife in their daycare," he suffers from severe pain "2-3 times per week," and he is "able to take frequent breaks" when assisting his wife; Tr. 763, noting that Plaintiff reported "continued pain issue[s]" and that he at times needs to "pick[] up and carr[y]" kids at the daycare, "which . . . caused exacerbation of his fibromyalgia").

In summary, the ALJ failed to provide specific and legitimate reasons to discount Dr. Gerondale's opinion.[8]

---

[8] The Court declines to address whether the ALJ erred in discounting Dr. Turner's opinion, because, as explained in Part II.D., the record evidence supports remand for an award of benefits.

### C.    Plaintiff's Symptom Testimony

#### 1.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (citing *Garrison*, 759 F.3d at 1014-15). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim*, 763 F.3d at 1163 (citation and quotations marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-00583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citations omitted).

#### 2.    Application

Here, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce the symptoms alleged. (*See* Tr. 18, reflecting that the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discrediting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ failed to do so here.

The Commissioner asserts that the ALJ provided three clear and convincing reasons for discounting Plaintiff's testimony. First, the Commissioner asserts that the ALJ discounted Plaintiff's testimony based on the "limited objective findings in the record." (Def.'s Br. at 22.) This was not a clear and convincing reason for discounting Plaintiff's testimony. As discussed, the record includes several tender-point examinations that constitute objective medical evidence of fibromyalgia. The record also reveals that Dr. Dykes determined that Plaintiff continues to meet the American College of Rheumatology criteria for fibromyalgia, and that Plaintiff suffers from many symptoms that doctors consider clinical signs of fibromyalgia. The Court thus concludes that the ALJ erred in discounting Plaintiff's testimony based on the lack of objective evidence supporting his claims of debilitating fibromyalgia pain. *See Revels*, 874 F.3d at 666 ("The ALJ stated that Revels' testimony was undercut by the lack of 'objective findings' supporting her claims of severe pain. . . . This reasoning was similar to his reasoning for rejecting Dr. Nolan's opinion, and was similarly erroneous. . . . [T]he examination [and imaging] results cited by the ALJ are perfectly consistent with debilitating fibromyalgia. The condition is diagnosed 'entirely on the basis of patients' reports of pain and other symptoms,' and 'there are no laboratory tests to confirm the diagnosis.' Indeed, fibromyalgia is diagnosed, in part, by evidence showing that another condition does not account for a patient's symptoms.") (citation omitted).

Second, the Commissioner asserts that the ALJ appropriately discounted Plaintiff's testimony based on his activities. (Def.'s Br. at 23.) In discounting Plaintiff's testimony on this

ground, the ALJ relied largely on Plaintiff's ability to lift his dog, walk his dog, work at his now ex-wife's in-home daycare business, hike, and perform work at his house. (*See* Tr. 18-20.) As discussed above, the record shows that Plaintiff complained of increased pain and reduced his activity level, and that the ALJ failed to evaluate the record in its proper context. As a result, the Court finds that the ALJ erred in discounting Plaintiff's testimony based on his reported activities.

Third, the Commissioner asserts that the ALJ appropriately discounted Plaintiff's testimony because his psychological impairments improved with medication and therapy. (Def.'s Br. at 22.) Even if this were a clear and convincing reason for discounting Plaintiff's testimony, this case turns on Plaintiff's fibromyalgia-related limitations and symptoms, such as pain, fatigue, and difficulty sleeping. The objective evidence supports Plaintiff's testimony about such limitations and symptoms. Plaintiff also consistently described the severe limitations on his ability to engage in daily activities. The Court thus concludes that Plaintiff's psychological improvement, standing alone, does not amount to substantial evidence supporting the ALJ's decision to reject Plaintiff's testimony. *See Burrell*, 775 F.3d at 1140 (holding that the ALJ erred in discounting the plaintiff's testimony based on one "weak" reason and several erroneous reasons).

### D.    Remedy

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). "Before [a court] may remand a case to the ALJ with instructions to award benefits, three requirements must be met." *Burrell*, 775 F.3d at 1141. Those requirements are "'(1) the record has been fully developed and further administrative proceedings would serve no useful purpose;

(2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'" *Id.* (quoting *Garrison*, 759 F.3d at 1020). The court, however, "retain[s] 'flexibility' in determining the appropriate remedy," even if the claimant meets the above requirements. *Id.* To be sure, the court is not "required to credit evidence as true and remand for an award of benefits," and may instead remand for "further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id.* (citation omitted).

The Court exercises its discretion to remand for an award of benefits because, as explained below, Plaintiff satisfies the above requirements, and because this case is not one in which the Court's evaluation of the longitudinal record creates serious doubt about whether Plaintiff is disabled. Simply put, the longitudinal record supports Plaintiff's complaints of debilitating pain, and the VA and many of Plaintiff's treating and examining providers support his claim for disability.

The Commissioner asserts that further proceedings are necessary given Plaintiff's reported activities and the ALJ's need to examine and weigh evidence that she "overlooked or undervalued . . . in the first instance." (Def.'s Br. at 25-26.) The Court disagrees. "[A] claimant's testimony *alone* may establish disability and an entitlement to benefits." *Rawa v. Colvin*, 672 F. App'x 664, 668 (9th Cir. 2016) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007)). In *Lingenfelter*, for example, the Ninth Circuit remanded for an award of benefits "when the claimant testified that he needed to lie down throughout the day due to his impairment, and the VE testified that such a limitation would prevent sustained work." *Id.* (citation omitted).

Similarly in *Rawa*, the Ninth Circuit remanded for benefits when the claimant "testified that, due to pain and muscle weakness, she needed to rest for seven hours out of an eight-hour work day and to lie down frequently," and the VE testified that such a limitation "would preclude employment." *Id.*

Plaintiff testified (and the record supports) that his fibromyalgia pain significantly disrupts his sleep and, as a result, he typically needs to take two to three hour-long naps per day. (Tr. 45.) Plaintiff also testified (and the record supports) that when he is awake, he spends most of his day in a reclined position because it helps alleviate his chronic pain symptoms. (Tr. 45.) The VE testified that an individual suffering from this level of impairment could not sustain gainful employment. (*See* Tr. 57-58, reflecting that the VE testified that the need to "lie down or recline in excess of 90 minutes during an eight-hour day" would preclude gainful employment). Thus, if credited as true, Plaintiff's testimony about his severe fibromyalgia pain and debilitating symptoms would require the ALJ to conclude that Plaintiff was in fact disabled. The Court therefore reverses the Commissioner's decision and remands for an award of benefits. *See Rawa*, 672 F. App'x at 668-69 (reversing for an award of benefits under similar circumstances).

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS for an award of benefits.

**IT IS SO ORDERED.**

DATED this 10th day of September, 2019.

STACIE F. BECKERMAN
United States Magistrate Judge